IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:11CR375 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | MEMORANDUM AND ORDER |
| MOISES MEJIA-FLORES, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the defendant's objection, Filing No. 41, to the findings and recommendation ("F&R") of the magistrate judge, Filing No. 39; Filing No. 40, Transcript ("Tr.") at 39-43. The magistrate judge recommended denial of the defendant's motion to suppress statements and evidence, Filing No. 29. *See* Filing No. 39, F&R at 1; Filing No. 40, Tr. at 42. The defendant was charged with two counts of making a false representation of a Social Security number that was not assigned to him with the intent to deceive, in violation of 42 U.S.C. § 408(a)(7)(B).

Pursuant to 28 U.S.C. § 636(b)(1)(A), the court has conducted a de novo determination of those portions of the F&R to which the defendant objects. *United States v. Lothridge*, 324 F.3d 599, 600-01 (8th Cir. 2003). The court has reviewed the record including the transcript of the hearing on the motion to suppress on January 4, 2012. Filing No. 40, Tr.

**I. BACKGROUND**

The court adopts the factual findings of the magistrate judge and they need not be fully repeated here. Briefly, the magistrate judge found that the Department of Homeland Security/Immigration Customs Enforcement, Homeland Security Investigations ("ICE" or

"ICE/HSI") conducted an audit and inspection of I–9 Forms[1] at Quality Pork International ("QPI") in Omaha, Nebraska, during the late summer of 2011. Filing No. 40, Tr. at 39. The auditor determined that there were approximately two dozen individuals working at QPI using the names of individuals who had submitted complaints of identity theft to the Federal Trade Commission ("FTC") with respect to either their drivers' licenses or Social Security numbers. *Id.* An individual by the name of Jerry Campos had submitted an FTC complaint. *Id*.

Following the initial review of the I-9s that had been obtained from QPI, Special Agent David Gran was assigned to conduct an enforcement operation at QPI. *Id.* at 39. On October 4, 2011, approximately 20 ICE agents arrived at the QPI plant. *Id.* With the assistance of the QPI Human Resources Department, approximately 24 individuals were individually called to an office at the front of the plaint. *Id.* at 40. Two or three ICE agents either sat at or stood near a table in the interview room. *Id.* All of the agents were in civilian clothes, and no firearms were displayed. *Id.* Agent Gran asked each individual his or her name, where he or she was born, and whether he or she had any documents permitting them to be in the United States or to work in the United States. *Id.*

The defendant responded that his name was Moises Mejia-Flores, he was born in Mexico, and did not have documents allowing him to be present or working in the United States. *Id.* At that point, he was taken into custody and brought to agents waiting in

---

[1] An I-9 form is an employment eligibility verification form that all U.S. employers are required to complete and retain for each individual they hire for employment in the United States. The employer must indicate on the form that identity documents have been examined and appear to be genuine. See United States Citizenship and Immigration Services website at www.uscis.gov.

another part of the room.  *Id.* at 40-41.  He was then handcuffed and prepared for transportation to the detention removal office for processing.  *Id.* at 41.

At the hearing, Agent Gran testified that an I-9 audit involved subpoenaing employment records and running them through government and private databases, including records of FTC complaints and immigration records checks.  *Id.* at 5.  As part of the enforcement operation, ICE/HSI officers instructed QPI management to bring the individuals whose names matched those in the databases from the production area to an interview area.  *Id.* at 7.  The agents immediately identified themselves to the individuals who had been summoned, showing badges and credentials.  *Id.* at 5.  Agent Gran stated that while two or three agents were present in the interview area of an L-shaped room, the other 17 agents were near the back part of the main room, out of view of the persons who were being interviewed.  *Id.* at 22.  Agent Gran acknowledged that it was possible that the defendant could have seen the other 17 agents who were around the corner in the L-shaped room.  *Id.* at 30.  Agent Gran testified that he questioned the individuals in Spanish.  *Id.*  He also testified that an identification document issued by the State of Nebraska was found on the defendant when he was arrested.  *Id.* at 20.  Also, Agent Gran stated that during administrative processing, fingerprints are run through an ICE automated system tied to the FBI's automated fingerprint identification system.  *Id.* at 20.

Agent Gran also testified about his administrative arrest authority, stating that:

> [I]f an immigration officer has belief that an individual is—or has reasonable suspicion that a person is within the United States and may be an alien, we have the right to talk to them.
>
> And in this case we did, and then based on the fact that the person—if we have reason to believe that the person or persons are illegally in the United States, based on our investigation, or based on answers they provide,

3

> then we may be able to take them into custody without a warrant and then within a set period of time then we have signed by the appropriate, or the, you know, persons in authority a notice to appear and a warrant of arrest and bonding determination prior to their being sent to immigration court.

*Id.* at 12. Agent Gran testified that the primary focus of the enforcement action at QPI was criminal, rather than administrative. *Id.* at 13. He further explained:

> We were going to present these people for prosecution, but what we did is, we started first by asking them questions to determine their immigration status.
>
> And then after they were—after it was determined that these people work illegally in the United States, they were placed into administrative custody.
>
> And shortly after that, we immediately, you know, within a day or so started the process for criminal prosecution by contacting the U.S. Attorney's criminal chief to seek criminal prosecution.

*Id.* He also stated that it was important for him to know where the individual was born because "that relates to his authority as an immigration officer" since "if a person is born in a foreign country . . . we have official enforcement jurisdiction over those people." *Id.* Agent Gran testified that he did not ask the defendant any questions other than the three preliminary questions and did not ask him about his use of identification documents or use of a Social Security card or number to obtain employment at QPI. *Id.* at 17. Agent Gran also stated that if an individual chose not to answer questions, the protocol would be to "make a telephone call to the criminal division chief of the U.S. Attorney's Office . . . to request a warrantless arrest based on probable cause with a subsequent filing an affidavit and criminal complaint." *Id.* Also, Agent Gran testified that he would not have allowed the defendant to leave the interview room. *Id.* at 29. Further, he stated that he believed he had probable cause for an arrest before interviewing the defendant. *Id.* at 29-30.

Agent Gran testified that once the defendant had answered the three questions, he was escorted from the room to the waiting agents and "at that point he was placed under arrest, handcuffed and taken into custody." *Id.* at 17. Agent Gran testified that at that time he considered the arrest to be an administrative arrest "because we were going to process him at our detention area and then we would be seeking the criminal—we would be seeking authorization for criminal prosecution the next day." *Id.* at 18. He further testified that "HSI managers authorized [the defendant] detained without bond because criminal prosecution was being sought." *Id.* at 19.

The magistrate judge found the defendant was not in custody for purposes of *Miranda* at the time he was questioned in the office. *Id.* at 42. He also found that the three questions did not amount to interrogation requiring a *Miranda* warning. *Id.* He noted that the "Eighth Circuit has held that routine questions for basic identification purposes is not interrogation under *Miranda* even if the information turns out to be incriminating." *Id.* Further, he found that even if the defendant "had been entitled to *Miranda* warnings before the three questions, ICE would have been able to establish his identity and the information gathered following his immigration detention would be admissible in evidence and not subject to exclusion." *Id.*

The defendant objects to the magistrate judge's findings and argues that the statements he made to ICE agents in the interview and the identification seized from him at the detention center should be suppressed because he was subjected to a custodial interrogation without having been given *Miranda* warnings. He argues that the agents were seeking to elicit incriminating evidence from the defendant for use in a criminal proceeding, rather than performing duties in connection with immigration status. Further, he argues that

the inevitable discovery doctrine is not applicable because there was no independent, substantial, alternative line of investigation.

## II. DISCUSSION

### A. Law

Under *Miranda v. Arizona,* 384 U.S. 436, 484 (1966), certain warnings must be given any time a suspect is in custody and is subject to interrogation by law enforcement officials. *United States v. Elzahabi,* 557 F.3d 879, 883 (8th Cir. 2009). In order to qualify for the Fifth Amendment privilege against self-incrimination that *Miranda* warnings are designed to protect, however, "a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 189 (2004).

Police officers are not required to administer *Miranda* warnings to everyone they question; the protections of *Miranda* apply only to an interrogation when the suspect is in custody. *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). "*Miranda* defines custodial interrogation as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *United States v. Hogan,* 539 F.3d 916, 922 (8th Cir. 2008) (quoting *Miranda*, 384 U.S. at 444). An individual is in custody when "a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest." *United States v. Flores-Sandoval,* 474 F.3d 1142, 1146 (8th Cir. 2007) (Flores-Sandoval II).

To determine whether a defendant is "in custody" for *Miranda* purposes, the court considers the "totality of the circumstances" confronting the defendant at the time of the interview. *Id.* The court's "focus during this inquiry is on 'objective circumstances, not on

subjective views of the participants.'" *United States v. Muhlenbruch,* 634 F.3d 987, 995-96 (8th Cir. 2011) (quoting *Flores-Sandoval II*, 474 F.3d at 1146). The court considers six factors in determining whether an individual is in custody for the purposes of *Miranda*: (1) whether the suspect was informed that he or she was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong-arm tactics or strategies were employed; (5) whether the atmosphere was police-dominated; or (6) whether the suspect was placed under arrest at the end of questioning. *Muhlenbruch*, 634 F.3d at 996. These factors are not exclusive; custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *United States v. Czichray,* 378 F.3d 822, 827-28 (8th Cir. 2004). The "most obvious and effective means of demonstrating that a suspect has not been taken into custody" is expressly advising the suspect that he is not under arrest and that his participation in questioning is voluntary. *United States v. Brave Heart,* 397 F.3d 1035, 1039 (8th Cir. 2005) (quoting *United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir. 1990)).

Not all government inquiries to a suspect in custody amount to interrogation. *United States v. McLaughlin,* 777 F.2d 388, 391 (8th Cir. 1985). Interrogation for *Miranda* purposes refers to any questioning or conduct that the government officer should know is reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980); *United States v. Ochoa-Gonzalez,* 598 F.3d 1033, 1038 (8th Cir. 2010). Interrogation is not limited to "express questioning," it also includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating

7

response." *Innis*, 446 U.S. at 301; *United States v. Lockett*, 393 F.3d 834, 837 (8th Cir. 2005).

Generally, asking a routine booking question is not interrogation under *Miranda*. *Id.* (noting that a request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating); *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion) (exempting questions to secure the biographical data necessary to complete booking or pretrial services from *Miranda's* coverage). Permissible questions include those that "appear reasonably related to the police's administrative concerns." *Id.* at 602; *United States v. McLean*, 409 F.3d 492, 498 (1st Cir. 2005) (the booking exception "allows police officers to ask general background questions (name, date of birth, etc.) while processing a newly arrested individual without advising him of his *Miranda* rights."). When the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, however, the questioning is subject to scrutiny under *Miranda*. *Ochoa-Gonzalez*, 598 F.3d at 1033; *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996). The "booking exception" to *Miranda* does not mean that any question asked during the booking process falls within that exception—without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions. *Muniz*, 496 U.S. at 602 n.14; *United States v. Scott*, 270 F.3d 30, 44 n.8 (1st Cir. 2001) (stating "[c]ases in which law enforcement officers have reason to know that routine booking questions may indeed produce inculpatory responses, however, form an exception to the exception"); *United States v. Parra*, 2 F.3d 1058, 1068 (10th Cir. 1993) (involving

questions about a suspect's true name "for the direct and admitted purpose of linking [the suspect] to his incriminating immigration file").

Also, to be covered by the Fifth Amendment and protected by *Miranda*'s exclusionary rule, the statement must be incriminating. *Hiibel,* 542 U.S. at 189 (involving the validity of a state's "stop and identify" statute, in the context of a valid *Terry*-type stop, under the Fifth Amendment). The Fifth Amendment does not prohibit the compelled disclosure of an individual's name "absent a reasonable belief that the disclosure would tend to incriminate him." *Id.* at 191. The "Fifth Amendment privilege against compulsory self-incrimination 'protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.'" *Id.* at 190 (quoting *Kastigar v. United States*, 406 U.S. 441, 445 (1972)). "Answering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances." *Id.* at 191 (noting that "[i]n every criminal case, it is known and must be known who has been arrested and who is being tried," and "[e]ven witnesses who plan to invoke the Fifth Amendment privilege answer when their names are called to take the stand.").

The Supreme Court acknowledges, however, that "a case may arise where there is a substantial allegation that furnishing identity at the time of a stop would have given the police a link in the chain of evidence needed to convict the individual of a separate offense," and "the court can then consider whether the privilege applies, and, if the Fifth Amendment has been violated, what remedy must follow." *Id.* Although it may be "a rare case indeed in which asking an individual his name, date of birth, and Social Security number would violate *Miranda*," there are situations where asking a person's name "might reasonably be

expected to elicit an incriminating response," for example in an "arrest for impersonating a law enforcement officer or for some comparable offense focused on identity." *United States v. Reyes*, 225 F.3d 71, 77 (1st Cir. 2000) (noting that "[i]n such scenarios, the requested information is so clearly and directly linked to the suspected offense that we would expect a reasonable officer to foresee that his questions might elicit an incriminating response from the individual being questioned."); *see also Ochoa-Gonzalez*, 598 F.3d at 1039 (finding that inquiry as to name was routine information where the defendant's name was never in doubt and was not directly relevant to the substantive offense); *Brown*, 101 F.3d at 1274 (finding a defendant's name was not relevant to his arrest for a drug crime).

Interrogation that relates to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure. *INS v. Delgado*, 466 U.S. 210, 216 (1984). The systematic questioning of employees at a workplace is not a seizure because "[o]rdinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers" and "most workers could have had no reasonable fear that they would be detained upon leaving." *Id.* at 218-19. Under the Fourth Amendment, when officers have no basis for suspecting a particular individual, they may generally ask questions of the individual and ask to examine the individual's identification. *Id*. at 216; *United States v. Escobar*, 389 F.3d 781, 786 (8th Cir. 2004). Police may not, however, convey a message that compliance with their requests is required. *Florida v. Bostick*, 501 U.S. 429, 435 (1991).

An alien present in this country who was inadmissible when he entered is deportable. *United States v. Quintana*, 623 F.3d 1237, 1240 (8th Cir. 2010). "'A deportation

proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime.'" *Id.* (quoting *INS v. Lopez-Mendoza,* 468 U.S. 1032, 1038 (1984)). Immigration law is generally regulatory rather than criminal and deportation hearings are civil proceedings. *Lopez-Mendoza,* 468 U.S. at 1038; *United States v. Perez-Perez,* 337 F.3d 990, 997 (8th Cir. 2003) ("Civil deportation proceedings do not trigger the criminal rules of procedure"). The exclusionary rule does not apply to civil deportation proceedings, in part because "the INS has its own comprehensive scheme for deterring Fourth Amendment violations by its officers." *Lopez-Mendoza,* 468 U.S. at 1044-45 (noting that "[t]o safeguard the rights of those who are lawfully present at inspected workplaces the INS has developed rules restricting stop, interrogation, and arrest practices" and the "regulations require that no one be detained without reasonable suspicion of illegal alienage, and that no one be arrested unless there is an admission of illegal alienage or other strong evidence thereof.").

Immigration officers are authorized, without a warrant, "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States . . . " and "to arrest any alien in the United States, if [they have] reason to believe that the alien so arrested is in the United States in violation of any [law or regulation involving the admission, exclusion, expulsion or removal of aliens] <u>and</u> is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(1) & (2) (emphasis added); *Quintana,* 623 F.3d at 1240. Immigration officers also have the power, without a warrant, to make arrests

> for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony, if the officer or employee is

11

> performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

8 U.S.C. § 1357(a)(5)(B); *see* 8 C.F.R. 287.5(c)(4). The authority granted to immigration officers is not unbounded, but is subject to the principles of the Fourth Amendment as it relates to searches and seizure. *United States v. Rodriguez-Franco*, 749 F.2d 1555, 1559 (11th Cir. 1985); *Rajah v. Mukasey*, 544 F.3d 427, 441 (2d Cir. 2008) (noting that the Fourth Amendment provides protection against random or gratuitous questioning related to an individual's immigration status).

Under the component of the Immigration and Nationality Act that authorizes interrogation by immigration officers, 8 U.S.C. § 1357, those officers "may make forcible detentions of a temporary nature for the purposes of interrogation under circumstances creating a reasonable suspicion, not arising to the level of probable cause to arrest, that the individual so detained is illegally in this country." *Au Yi Lau v. INS*, 445 F.2d 217, 223 (D.C. Cir. 1971) (applying *Terry* standards). Immigration authorities may not detain persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (rejecting the argument that a person's apparent Mexican ancestry alone justifies belief that he or she is an alien and satisfies the requirement of the statute allowing interrogation and arrests of aliens). A plain reading of 8 U.S.C. § 1357(a)(1) requires the government to show that immigration officials believe that a person is an alien before questioning him. *United States v. Flores-Sandoval,* 422 F.3d 711, 714 (8th Cir. 2005) (Flores-Sandoval I); *see also* 8 C.F.R. § 287.8(b)(2) (an immigration official may briefly detain a person for questioning if he "has a reasonable suspicion, based on specific articulable facts, that the person being

questioned is engaged in an offense against the United States or is an alien illegally in the United States").

Under the component of the statute authorizing arrest, "[b]ecause the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in 8 U.S.C. § 1357(a)(2) means constitutionally required probable cause." *Quintana*, 623 F.3d at 1240. The regulations promulgated under the Immigration and Nationality Act require immigration officers to obtain a warrant of arrest, "except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." 8 C.F.R. § 287.8(c)(2)(ii) (emphasis added). The regulations further provide that "[a]t the time of the arrest, the designated immigration officer shall, as soon as it is practical and safe to do so: (A) Identify himself or herself as an immigration officer who is authorized to execute an arrest; and (B) State that the person is under arrest and the reason for the arrest." 8 C.F.R. § 287.8(c)(2)(iii). They also provide, "with respect to a person arrested and charged with a criminal violation of the laws of the United States, the arresting officer shall advise the person of the appropriate rights as required by law at the time of the arrest, or as soon thereafter as practicable." 8 C.F.R. § 287.8(c)(2)(v).

The regulations implementing 8 U.S.C. § 1357(a) carefully distinguish between warrantless arrests for the purpose of commencing civil deportation proceedings, and warrantless arrests for criminal violations. *Quintana*, 623 F.3d at 1240 & n.1 (noting that the regulations require that when a person is "arrested and charged with a criminal violation of the laws of the United States, the arresting officer shall advise the person of the appropriate rights as required by law," and must take the defendant without unnecessary delay before a magistrate judge or other appropriate judicial officer, whereas "[b]ecause

arrests under § 1357(a)(2) for the purpose of deporting an illegal alien result in 'civil' or 'administrative' removal proceedings, aliens held in that type of custody are not entitled to the protections of Rule 5(a) of the Federal Rules of Criminal Procedure [providing for appearance before a magistrate]"). When an individual is arrested on a reasonable belief that he has committed a felony, the regulation involving the conduct of arrests by immigration officers provides that a suspect be promptly advised of "appropriate rights as required by law," a proviso that is not included in the regulations on civil administrative arrests. *Compare* 8 C.F.R. § 287.8(c)(iii) & (iv) (regarding conduct of administrative arrests) *with* 8 C.F.R. § 287.8(c)(v) & (vi)(regarding conduct of arrests for felonies).

Fingerprints obtained by exploiting an unlawful detention, and under circumstances that are not sufficient to have purged the taint of the initial illegality, are also subject to application of the exclusionary rule. *United States v. Guevara-Martinez*, 262 F.3d 751, 756-57 (8th Cir. 2001) (noting that "[t]he absence of evidence that the fingerprinting resulted from routine booking, and the concomitant inference that an INS-related purpose motivated the fingerprinting" counseled in favor of applying the exclusionary rule); *see also Flores-Sandoval I*, 422 F.3d at 715 (suppressing fingerprint evidence, noting absence of consent to the taking of fingerprints and finding it "unlikely that [the defendant] felt free to decline [an immigration officer's] request for fingerprints and terminate the encounter.").[2]

---

[2]The Eighth Circuit Court of Appeals noted in that case that suppression would be of little value to the defendant since ICE could issue a detainer to retake custody of the defendant "because, as a jurisdictional rather than an evidentiary matter, his body and identity cannot be suppressed as fruit of the poisonous tree." *Flores-Sandoval I*, 422 F.3d at 715. The court commented that "ICE will likely obtain a new set of fingerprints from [the defendant] for civil deportation proceedings, and the government may recharge him with illegal re-entry after deportation" and stated that, though the result had "a somewhat academic feel to it," the court found that "reminding the government that it must do things 'the right way'" served an important interest. *Id.* (quoting *Guevara-Martinez*, 262 F.3d at 756).

Evidence obtained as a result of a constitutional violation may still be admissible if the later discovery is significantly attenuated from the primary violation, if the later discovery was inevitable, or if the later discovery was supported by an independent, taint-free source. *United States v. Villa-Gonzalez*, 623 F. 3d 526, 534 n.7 (8th Cir. 2010). "[T]he public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." *Nix v. Williams*, 467 U.S. 431, 443 (1984).

### B. Analysis

The court will not adopt the findings and recommendation of the magistrate judge. The distinction between the detention and administrative arrest of a suspected alien for deportation and the detention and arrest of an alien for a criminal offense is significant to this analysis. The increasing practice of subjecting aliens to criminal prosecution rather than civil deportation creates a different paradigm in these cases.

The court first finds that the defendant was in custody while in the interview room at QPI. The factors relevant to the custody determination weigh in favor of custody. No reasonable person in the defendant's position would have believed himself free to terminate the interview and leave. The immigration officer, in fact, admitted that the defendant would have been detained if he had attempted to leave or had refused to answer questions. He was not told that he was free to leave or that he was not under arrest. He did not possess freedom of movement, nor had he initiated the contact with the officer. The defendant had no choice but to acquiesce to the demands of his employer, who acted at the direction of ICE/HSI. Although there is no indication that strong-arm tactics or deceptive strategies were employed, the atmosphere in the interview room, and at the plant in general, was

clearly police-dominated. Twenty immigration agents were present. The defendant was placed under arrest at the end of the interview, and immediately transported for processing. The defendant's freedom of movement was restricted to a degree that a reasonable person in his position would associate with formal arrest and, accordingly, the court finds he was "in custody" when he was questioned in the interview room.

The court further finds that the questioning of the defendant amounted to interrogation that does not fall within the "routine booking" exception to *Miranda*. Under the circumstances of this case, asking the defendant his name, knowing that QPI management had identified him as the individual working under the name "Jerry Campos," was clearly designed to elicit an incriminating response. The Fifth Amendment is not implicated when the disclosure of a name presents no reasonable danger of incrimination, so asking an individual his name and country of origin is generally valid in the deportation context, or as part of either a purely consensual encounter or a permissible *Terry*-stop. However, questioning a suspect as part of a criminal investigation is a different matter. The circumstances presented here involve the unusual situation where asking for identity information is directly relevant to the crime being investigated and the information provides a link in the chain of evidence necessary to convict the individual of the offense. The answer to a request for an individual's name and other identifying facts in these circumstances is not information that is "likely to be so insignificant in the scheme of things," that the inquiries should be permitted without constitutional safeguards.

The ICE officer's reliance on his administrative arrest authority in conducting the interrogation is misplaced. The Immigration and Nationality Act authorizes only brief interrogations of a suspected alien with respect to the person's right to be or remain in the

United States.  It does not encompass custodial interrogations of suspected felons and, in fact, instructs immigration officers to promptly give *Miranda* warnings to those individuals arrested for felony crimes.  Although a warrantless arrest is authorized under 8 U.S.C. § 1357, the regulations promulgated thereunder contemplate a warrantless arrest only if the officer has both a reason to believe that an immigration offense or other felony crime is being committed <u>and</u> a reason to believe that the person is likely to escape before a warrant can be obtained.  There is no evidence that ICE officers had a reason to believe the targeted individuals were likely to escape before an arrest warrant could have been obtained.  In this case, the FTC reports furnished a reason to believe the felony crime of identity theft was being or had been committed.  Once the immigration officers were informed that an QPI employee was working under a name that had been the subject of an FTC complaint, they had probable cause to arrest that individual.  After the defendant had been identified by his employer as the person using the fraud victim's name and Social Security number, the ICE agents had probable cause to arrest the defendant.  It would have been reasonable for the officers to have believed that, once alerted to the fact of a Social Security fraud investigation, an individual using a stolen or fraudulent Social Security number would not be likely to either remain at or return to his place of employment.  Instead of questioning the defendant as if the investigation was an part of a civil deportation exercise, a more appropriate course of conduct would have been to identify the defendant through his employer, arrest him, give him a *Miranda* warning, and then question him.  By his own admission, ICE Agent Gran and his team were not at QPI to conduct administrative deportations; they were there to investigate identity-theft crimes.  The agent admitted that the purpose of the investigation was criminal prosecution and that he had probable cause

to arrest the defendant whether or not he made any statements because the employer could link the defendant to the fraudulent or stolen Social Security number.

The record shows that ICE/HSI had targeted 24 individuals and came prepared to transport those individuals back to immigration headquarters for booking. They sought information, in a custodial setting, that went to an element of the offense for which the defendant was targeted, investigated, and eventually criminally charged. Armed with the knowledge that a person by the name of Jerry Campos had filed a complaint involving fraudulent use of his Social Security number and the further knowledge that a person at QPI was working under that name, a reasonable officer would know that asking for that individual to identify himself would be likely to elicit an incriminating response. Moreover, the officers had already ascertained each individual target's "identity" by having QPI management separately identify the suspects, using means that did not trigger *Miranda* concerns. Reliance on the "booking exception" to support the custodial questioning fails because the exception applies only to newly-arrested individuals and the defendant, although not free to leave, had not been arrested at the time he was asked the identification questions.

The record in this case shows that immigration officers, from the outset, were investigating a criminal matter and not pursuing an administrative arrest and deportation. Because the encounter at the defendant's workplace fell within the purview of a criminal investigation, the defendant was entitled to Fourth and Fifth Amendment protections he would not be given in a civil case. This was not the sort of systematic questioning, akin to a consensual encounter, that the Supreme Court approved in *INS v. Delgado*. There was nothing consensual about gathering specifically-targeted individuals in a room for

questioning. The facts in this case do not involve an encounter in which a police officer approaches an individual and asks a few questions, if the citizen is willing to listen, when the officer has no reason to suspect criminal activity. The defendant was specifically targeted and investigated for a serious crime. The immigration officer admitted the defendant was an identity-theft suspect. The officer was reasonably aware that the information he sought, while it may have been in the nature of identification in an ordinary case, was directly relevant to the substantive offense being investigated.

The defendant also challenges the magistrate judge's conclusion that the evidence of his identity, as well as the State of Nebraska identification document, would have inevitably been discovered. There is no apparent dispute that the defendant was subject to administrative arrest and deportation as an illegal alien. Although questioning the defendant in custody violated the defendant's rights under the Fifth Amendment, the court finds that the evidence of identity would have inevitably been discovered in the civil context. Absent the statements the defendant made in the custodial interrogation, the officers would have been able to determine his identity. The court is aware that this may be an academic exercise, but, like the Eighth Circuit Court of Appeals, finds that reminding the government that it must do things the right way serves an important interest. *See Flores-Sandoval I*, 422 F.3d at 715. The court finds the defendant's objection to the magistrate judge's F&R should be sustained with respect to the defendant's statements, but denied in all other respects. Accordingly,

IT IS HEREBY ORDERED:

1. The defendant's objection (Filing No. 41) to the magistrate judge's findings and recommendation (Filing No. 39 & Filing No. 40) is sustained in part, in accordance with this order.

2. The findings and recommendation of the magistrate judge (Filing No. 39 & Filing No. 40) are adopted in part and rejected in part, in accordance with this order.

3. The defendant's motion to suppress (Filing No. 29) is sustained with respect to the defendant's statements, but denied in all other respects.

DATED this 16th day of February, 2012.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge

_____

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.